Carl B. Carter and Jewell Carter et al. [1] v. Commissioner. Carter v. Commissioner
Docket Nos. 56923-56927.
United States Tax Court
T.C. Memo 1958-166; 1958 Tax Ct. Memo LEXIS 64; 17 T.C.M. (CCH) 816; T.C.M. (RIA) 58166; August 29, 1958
*64 1. Birmingham Business College, Inc., (B.B.C.) was formed in 1941 by Griffith and his two sisters, Jewell and Audrey, each of whom owned one-third of its stock. For the first few years its enrollment was not great and it did not file any returns. In 1946, with the rise in enrollment due to the attendance of Veteran students, B.B.C. applied to the Commissioner for tax exempt status as an educational institution under section 101(6), Internal Revenue Code of 1939. The application contained erroneous statements of fact. The Commissioner in reliance on the application granted the exemption. In 1952, the Commissioner conducted an extensive investigation of B.B.C.'s affairs. The Commissioner found that the books and records of B.B.C. did not adequately or accurately reflect its income and that the shareholders of B.B.C. had generally treated B.B.C.'s money and property as their own, e.g., commingling funds, making personal expenditures from B.B.C.'s funds and depositing B.B.C.'s receipts in their own accounts. The Commissioner revoked B.B.C.'s exempt status and directed it to file returns for all years since inception. B.B.C. refused. The Commissioner determined deficiencies which were *65 based to a large extent on the treatment of many payments to or on behalf of the shareholders as dividends. Held: that B.B.C. has failed to prove that it was organized and operated exclusively for educational purposes and that "no part of its net earnings inured to the benefit of a private shareholder or individual" and therefore it is not entitled to tax exempt status under section 101(6) of the 1939 Code; that the retroactive revocation of B.B.C.'s tax exempt status was not improper; and that the statute of limitations does not bar the proceedings for any year. Held, further, that the Commissioner's determination that many of the payments to the individual shareholders represented dividends is, with certain exceptions, reversed on the ground that the payments represented sales expenses, reasonable compensation and loans, but that the Commissioner's determination is in all other respects upheld. 2. The Commissioner determined deficiencies against the individual shareholders for certain years. The deficiencies were primarily based on additional income labeled dividends from B.B.C. Held, that the amounts determined to be dividends primarily represent reimbursed sales expenses of B. *66 B.C., reasonable compensation and loans. However, the Commissioner is sustained in part since the amounts representing reasonable compensation would be income to the recipients. 3. The Commissioner's determination of additions to the tax under sections 291(a), 293(a), 294(d)(1)(A), and 294(d)(2), Internal Revenue Code of 1939, is sustained. John Ike Griffith, Esq., 1014 Nineteenth Court South, Birmingham, Ala., for the petitioners. Frederick T. Carney, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax, declared value excess profits tax, excess profits tax, and additions thereto under sections 291, 293, and 294 of the Internal Revenue Code of 1939, [2] as follows: Birmingham Business College
Docket No. 56927
Additions to Tax
Taxable
Sec.
Sec.
Year
Income Tax
291(a)
293(a)
1942
$ 159.78
$ 39.95
$ 7.99
1943
846.25
211.56
42.31
1944
2,640.14
660.04
132.01
1945
2,636.55
659.14
131.83
1946
4,482.59
1,120.65
224.13
1947
3,878.85
969.71
193.94
1948
1,518.84
379.71
75.94
1949
3,040.24
760.06
152.01
1950
19,262.73
4,815.68
963.14
1951
11,658.56
2,914.64
582.93
Declared
Value Excess
Profits Tax
1942
$ 84.37
$ 21.09
$ 4.21
1943
446.82
111.71
22.34
1944
1,350.28
337.57
67.51
1945
2,015.61
503.90
100.78
Excess Profits Tax
1944
$ 69.00
$ 17.25
$ 3.45
1945
4,389.91
1,097.48
219.50
*67 Jewell Carter - Docket No. 56924
Additions to Tax
Year
Income Tax
291(a)
293(a)
294(d)(1)(A)
294(d)(2)
1945
$ 864.00
$216.00
$ 43.20
1946
1,258.24
314.56
62.91
Carl B. Carter and Jewell Carter - Docket No. 56923
1947
$1,085.12
$ 54.26
1948
498.70
24.94
1949
751.32
37.56
1950
1,115.52
55.78
$113.64
$ 68.19
1951
630.34
31.52
54.47
32.68
John Ike Griffith - Docket No. 56925
1947
$1,390.74
$ 69.54
1948
361.83
18.09
1949
189.00
9.45
1950
1,013.75
50.69
$115.56
$ 69.35
Hulon A. Spears and Audrey G. Spears - Docket No. 56926
1948
$ 218.26
$ 10.91
1949
331.48
16.57
1950
6,120.32
306.02
$642.72
$385.63
1951
2,267.32
113.37
239.76
143.86
The deficiencies in the docket involving Birmingham Business College are based upon respondent's determination that Birmingham Business College, which did not file returns for any of the years involved, was not exempt from taxation under section 101(6) and that it had net income subject to taxation. The deficiencies in the dockets involving the individuals are due to the respondent's determination that they received income in the form of dividends and salary from Birmingham Business College which was in excess of the amounts *68 reported by them on their respective returns. In Docket No. 56925, John Ike Griffith, petitioner, respondent also determined that certain professional income should be added to the income shown on the returns. In Docket Nos. 56923 and 56925, certain claimed dependency exemptions were disallowed but are not in issue. Findings of Fact A stipulation of facts has been filed and is incorporated herein by this reference. General Petitioner Birmingham Business College (hereinafter referred to as B.B.C.), an Alabama corporation with its principal and only place of business in Birmingham, did not file income tax, declared value excess profits tax or excess profits tax returns for any of the calendar years ended December 31, 1941, through December 31, 1951. Petitioner John Ike Griffith (hereinafter referred to as Griffith), a resident of Birmingham, filed individual returns for the taxable years 1947 to 1950 with the Collector of Internal Revenue at Birmingham. Petitioners Hulon A. and Audrey G. Spears (hereinafter referred to as Hulon and Audrey, respectively), husband and wife, filed joint individual returns for the years 1948 to 1951 with the Collector of Internal Revenue at Birmingham. *69 Petitioner Jewell Carter (hereinafter referred to as Jewell) did not file any individual returns for the years 1945 and 1946; petitioners Jewell and her husband, Carl B. Carter (hereinafter referred to as Carl) filed joint individual returns for the years 1947 to 1951 with the Collector of Internal Revenue at Birmingham. I(A) - Tax Exempt Status of B.B.C. Around 1939-1940, Griffith was employed as a principal of a small public school at a salary of $165 per month. He also practiced law part time. About that time he lent his credit to two men who were operating a business school known as Birmingham Business College. Before long Griffith was personally indebted for a substantial amount of liabilities for expenses incurred by the school. The two operators left the school in Griffith's hands. Griffith induced his two sisters, Audrey and Jewell, to leave their teaching positions in the public school in Jackson County and come to Birmingham and run the school. After conducting the school for a short while Griffith decided to incorporate. Griffith attempted to draw the corporate charter so as to avoid the various taxing statutes and to take advantage of the state and Federal tax laws which *70 exempt non-profit educational institutions from taxation. He had heard that the Commissioner of Internal Revenue had ruled that an educational institution could retain its tax exempt status as long as it did not pay more than $10,000 per year to an individual in salary. Having taught in the public schools he could not conceive of paying himself a salary in excess of $10,000. On October 20, 1941, B.B.C. was incorporated under the laws of Alabama. Its charter recited, inter alia, as follows: "KNOW YE, That the undersigned desire to become a body corporate for the purpose of operating a non-profit, eleemosynary institution of learning, known as the Birmingham Business College, to train students in the arts and skills of business training for the purpose of taking deserving boys and girls out of employment and raising their educational standards and securing them employment, and for other purposes, and the incorporators elect the privilege of claiming the exemptions allowed such institutions from exemption of taxation as provided under the laws of the State of Alabama. This document is to become and is also in the form of a contract between the incorporators that they shall not pay themselves *71 salaries except in a manner of ratio and proportion to the amount of common or capitol [capital] stock held by each stockholder and that two of the stockholders holding a majority of the stock can not get together and agree to vote themselves salaries out of proportion to the amount of common stock held by each stockholder and that this agreement is binding forever and is perpetual. That when a stockholder sells or otherwise disposes of his common or capitol [capital] stock he or she automatically forfeits his right under this contract in the ration and proportion to the amount of stock disposed of." One hundred shares of no par value stock and a capitalization of $2,000 were provided for. The incorporators were Audrey, Jewell, and Dora Ann Griffith, hereinafter referred to as Dora, the mother of Griffith, Audrey, and Jewell, each of whom (incorporators) subscribed to 33 1/3 shares. The charter named Griffith as president, Dora as vice president, Jewell as treasurer, and Audrey as secretary. The amount of $2,000 was paid in to B.B.C. for the stock. The money was borrowed from Dora and the 33 1/3 shares that she held were merely held as security for the loan. Griffith was the beneficial *72 owner of her stock. On December 10, 1948, an amendment to the charter and incorporation papers of B.B.C. was filed in the Probate Court of Jefferson County, Alabama, substituting Griffith for Dora as owner of one-third of the capital stock of B.B.C. for the purpose of showing the correct ownership of B.B.C. stock. By application (Form 1023) dated May 22, 1946, B.B.C. applied to the Commissioner of Internal Revenue for tax exemption under section 101(6). The application, which is in the form of an affidavit, was signed by Griffith and included, inter alia, the following questions and answers: "Q. Is the organization the outgrowth or continuation of any form of predecessor? "A. No. "Q. Is the organization authorized to issue capital stock? "A. No. "Q. If so, state (1) the class or classes of each stock, (2) the number and par value of shares of each class outstanding, and (3) the consideration paid for outstanding shares. "A. It is a non-stock, closed, eleemosynary educational institution. Non-profit - All profits or money above operation goes into the expansion and modernizing the facilities to instruct the students. "Q. If capital stock is outstanding, state whether any dividends *73 or interest has been or may be paid thereon? "A. [No answer.] "Q. If any distribution of corporate property of any character has ever been made to shareholders or members, attach hereto a separate statement containing full details thereof, including (1) amounts or value, (2) source of funds or property distributed, and (3) basis of and authority for distribution. "A. [No information given.] "Q. State all sources from which the organization's income is derived. "A. Monthly tuition from the students. "Q. (a) For what purposes, other than in payment for services rendered or supplies furnished, are the organization's funds expended? "A. Reserve to maintain the services in depression years, - and the betterment of the services rendered, - such as new buildings, new equipment, etc. (b) If any payments are made to members or shareholders for services rendered the organization, attach a separate statement showing the amounts so paid and the character of the services rendered. "A. [No information given.] "Q. Does any part of the net income of the organization inure to the benefit of any private shareholder or individual? "A. No." Pursuant to and based upon the representations contained in *74 the above-mentioned application, by letter dated July 16, 1946, and signed E. I. McLarney, Deputy Commissioner, the Bureau of Internal Revenue (as it was then called) ruled that in its opinion B.B.C. was exempt from Federal income tax and not required to file returns of income "unless you change the character of your organization, the purpose for which you were organized, or your method of operation." In March 1952, Frederick E. Gilbert, an Internal Revenue agent, contracted Griffith in regard to the exempt status of B.B.C., requesting certain corporate records and financial statements be made available for examination. Griffith explained that the books were not brought up to date and that financial statements would have to be prepared. Gilbert suggested that a competent accountant be employed to do the job. Harold Van Baalen, a public accountant who taught accounting at B.B.C., was hired by Griffith to make an audit of the school's affairs. The records of B.B.C., which included cash journals, canceled checks, bank statements, tuition receipts, and various miscellaneous data, were not complete. Also, the cash journals and other books were not in order but were loosely kept. They did *75 not adequately or accurately show the receipts, disbursements, income, or expenses of B.B.C. Van Baalen attempted to reconstruct the income of B.B.C. from the records. He devoted about 250 hours to his audit of B.B.C.'s affairs. Van Baalen accepted the information contained in the records as transcribing what actually occurred. In other words, if there was an item recorded in the cash books such as sales expense $20, he accepted it as being so without trying to verify the expenditure. He was primarily trying to reconstruct income from the facts shown on the existing records. He summarized his findings in an audit report which he submitted to Griffith and to Gilbert. His method of reconstructing B.B.C.'s income was summarized in his report as follows.. "1. Eliminated the postings of all cancelled checks from cash receipts and disbursements journal. This to avoid duplications in analysis and classification. "2. Summarized all cancelled checks by months, paying particular attention to checks made out to 'cash', who endorsed same and if possible to identify with 'cash' entries in the disbursements journal. "3. Summarized all the remaining entries in disbursements journal, assuming that *76 all had been paid for in cash. "The basis of my work is that the college realized income and receipts from borrowed money to the extent of at least the total disbursements for expense and to shareholders. With exception of $21,000.00 of income in 1950 from Veterans Administration and the fact that Mr. Gilbert included the $20,144.88 loaned to Mrs. H. A. Spears in his report as net income to corporation, we are in substantial agreement as to income and expense. The 1950 income of $21,000.00 from Veterans Administration was not recorded in any way on your records and there was no excess of disbursements over receipts in this year. In allocating receipts to college, I used either the bank deposits or cash receipts journal entries, whichever was the higher." The report contained profit and loss statements for the years 1941 to 1950, inclusive, which can be summarized as follows: Year
Income
Expense
Profit
1941
$ 3,935.81
$ 4,035.34
($ 99.53)
1942
6,326.80
5,331.18
995.62
1943
12,786.19
8,988.99
3,797.20
1944
23,415.89
14,205.77
9,210.12
1945
20,961.39
16,183.75
4,777.64
1946
36,591.72
25,140.81
11,450.91
1947
47,276.64
33,910.05
13,366.59
1948
57,767.45
47,484.75
10,282.70
1949
102,212.49
70,080.66
32,131.83
1950
136,303.10
94,228.21
42,074.89
Total
$447,577.48
$319,589.51
$127,987.97
*77 There was no authorization in the minutes or any indication in other records relating to salaries for Griffith, Jewell, and Audrey. The amounts drawn by them were usually labeled "Drawings" and not salary. Van Baalen, therefore, did not include these amounts labeled drawings in his expense amounts. He did include in expense, payments to Carl and Hulon which were marked salary on the books. [3] He also included in expense the amounts paid to the members of the family which were marked sales expense, travel expense, etc. Van Baalen found the cash drawings of the members of the family to be as follows: Carl and
John Ike
Hulon and
Year
Jewell Carter
Griffith
Audrey Spears
Total
1941
$ 12.00
$ 12.00
1942
$ 83.50
54.59
$ 11.00
149.09
1943
303.02
501.35
429.53
1,233.90
1944
1,153.17
1,414.70
632.71
3,200.58
1945
1,477.59
1,720.46
964.97
4,163.02
1946
2,831.28
2,047.37
1,070.34
5,948.99
1947
2,462.17
4,315.09
2,014.57
8,791.83
1948
2,719.70
4,388.50
1,648.33
8,756.53
1949
3,448.70
3,253.11
4,373.00
11,074.81
1950
4,942.30
5,987.45
22,844.88
33,774.63
$19,421.43
$23,694.62
$33,989.33
$77,105.38 Van Baalen also found that for the 10-year period, 1941-1950, B.B.C. realized additional *78 income in the amount of $21,257.65. He termed this item "unidentified income" and determined that it should be charged to the individual shareholders. Van Baalen's audit was not entirely acceptable to Gilbert because Van Baalen was an employee of B.B.C., rather than a completely uninterested third party, and because Gilbert found it difficult to test check Van Baallen's work. Gilbert, therefore, conducted an audit of B.B.C. which took 66 days. Many of the procedures used by Gilbert in reconstructing the income of B.B.C. were similar to ones used by Van Baalen. By letter dated October 31, 1952, and signed Norman A. Sugarman, Assistant Commissioner by R. S. Gayton, the Bureau of Internal Revenue revoked the aforementioned ruling of July 16, 1946, and advised B.B.C. that it was required to file income tax returns for each year since incorporation. The letter stated, inter alia, as follows: "Information secured as the result of an examination of your books and records by the office of the Internal Revenue Agent in Charge, Birmingham, Alabama, discloses that from the time you commenced operating you have operated, in part at least, for the pecuniary benefit of your members. Your activities, *79 therefore, have not been those of an organization 'operated exclusively for * * * educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, * * *' as contemplated by section 101(6) of the Code under which you were held to be exempt." B.B.C. did not file returns in compliance with the terms of the letter. On December 21, 1954, the Commissioner issued his deficiency notices involved in the proceedings we have here. His determinations for the years 1941-1950 were based on the report of Gilbert and for the year 1951 on the report of Revenue Agent Thomas Shinn, who conducted the audit for that year. I(B) - Net Income of B.B.C. The Commissioner determined the income of B.B.C. on the cash basis and on a calendar year basis. The available records of B.B.C. did not include any entries on an accrual basis. A schedule of B.B.C.'s income and deductions as determined by respondent (with adjustments for certain concessions made on brief by respondent) is as follows: Gross
Net Income
Year
Income
Deductions
(loss)
1941
$ 782.81
$ 930.57
($ 147.76)
1942
6,323.02
6,260.81
62.21
1943
13,318.27
12,336.47
981.80
1944
23,104.88
16,275.51
6,829.37
1945
21,458.66
9,788.89
11,669.77
1946
39,764.26
23,513.95
16,250.31
1947
48,615.36
32,315.99
16,299.37
1948
64,058.23
57,019.79
7,038.44
1949
105,175.13
91,521.90
13,653.23
1950
153,524.32
104,989.36
48,534.96
1951
123,702.24
93,602.83
30,099.41
*80 I(B)(1) - Gross Income of B.B.C. For the years 1941-1950, the gross income as determined by the Commissioner included the following: (a) Income per cash journal - principally consists of receipts for tuition and supplies. (b) Unidentified income - the difference between the cash balance per books after all adjustments for the year had been made and the balance per bank. In some years this was a minus figure. (c) Gain on sale of real estate - In 1947, B.B.C. sold a piece of real estate for $4,600. The respondent determined the gain on the sale to be $600 and included that amount in gross income. (d) Rehabilitation income - B.B.C. received payments from the State of Alabama under a program for vocational rehabilitation. The following schedule shows the amounts entered on the B.B.C. cash journal as received from the State and the amounts which the State informed Gilbert that it had paid to B.B.C.: * *81 ADDITIONAL REHABILITATION
STUDENT INCOME
Per
Per
Cash
Additional
Year
Verification
Journal
Income
1947
$1,148.06
$ 604.50
$ 543.56
1948
1,573.78
183.35
1,390.43
1949
1,289.94
752.96
536.98
1950
1,284.10
574.29
709.81
$5,295.88
$2,115.10
$3,180.78
The difference not shown on B.B.C.'s cash journal was included in its gross income by respondent. (e) G.I. income - B.B.C. received payments from the Veterans' Administration (hereinafter sometimes referred to as V.A.) for educating Veterans under the G. I. Bill. The manager of the regional office of the V.A., in a letter to the respondent, stated that it paid B.B.C. $131,290.93 in 1950. Gilbert found only $111,788.27 entered as receipts on the B.B.C. cash journal. The Commissioner, therefore, included the difference of $19,502.66 ($131,290.93 minus $111,788.27) in B.B.C.'s gross income for 1950. Certain checks received by B.B.C. in 1950 or 1951 were not cashed by B.B.C. until a later year because of dispute with the V.A. Due to the dispute, the V.A. also withheld paying certain sums earned by B.B.C. during those years. For the year 1951, respondent determined B.B.C.'s gross income by the bank deposit method. I(B)(2) - Deductions of B.B.C. (a) General - The Commissioner included in his deductions all payments for certain expenses which were made to unrelated third parties. He did *82 not include payments made for the purchase of capital assets but did include depreciation of the items capitalized. Since he determined the B.B.C. incurred a net operating loss for 1941, he included the amount of that loss as a deduction in 1942. (b) Sales expense - B.B.C., throughout the years in question, conducted an active campaign to enroll students. It hired salesmen who traveled throughout Alabama and in parts of neighboring States, concentrating on rural areas. B.B.C.'s salesmen included Carl, who worked as a full-time salesman from May 16, 1944, until July 1948, and part time thereafter; Hulon, who worked as a salesman part time; Griffith, who worked as a salesman part time; and certain other persons. In addition to salesmen, Jewell and Audrey visited high schools thoughout Alabama on "Career Days" putting on exhibitions and explaining to high school students the value of a business education at B.B.C. Occasionally, one or two students would travel with Audrey or Jewell to help them with the exhibits. Audrey would usually give the salesmen expense money before they departed for the field. The salesmen would not keep records of the amount of expense money which they expended *83 and Audrey would not require them to substantiate their expenditures. B.B. C.'s funds were also used to pay for expenses incurred by Griffith, Audrey, and others in attending various conventions and clinics for business colleges and teachers. Audrey would usually enter the amounts paid in the cash journal as "Sales Expense," "Travel," or "Convention." The Commissioner has allowed deductions in full for the amounts entered in the cash book as "Sales Expense," "Travel," or "Convention" payments to persons other than Griffith, Carl and Jewell, and Hulon and Audrey. Regarding Griffith, Carl and Jewell, and Hulon and Audrey, the Commissioner disallowed a portion of the amounts received by them on the ground of lack of substantiation. The following schedule shows the amounts paid to them and shown on the books of B.B.C. as sales expense and the portion thereof allowed by the respondent as a deduction for the years 1943-1950: [4]
Griffith
Carl and Jewell
Hulon and Audrey
Amount
Amount
Amount
Year
Paid
Allowed
Paid
Allowed
Paid
Allowed
1943
$ 539.95
$100.00
$ 57.00
$ 57.00
1944
672.83
100.00
$ 426.75
$100.00
43.50
43.20
1945
1,363.75
350.00
1,366.02
350.00
30.00
30.00
1946
714.95
350.00
2,151.25
350.00
119.00
119.00
1947
887.90
350.00
2,379.58
350.00
811.01
350.00
1948
955.00
350.00
2,482.50
350.00
1,368.50
350.00
1949
351.00
350.00
2,106.00
350.00
613.60
350.00
1950
915.56
350.00
1,848.00
350.00
1,810.63
350.00
*84 The difference between the amounts paid and the amounts allowed as deductions was treated by the respondent as informal dividends to Griffith, Audrey, and Jewell and, therefore, not deductible by B.B.C. The amounts paid by B.B.C. to Griffith, Carl and Jewell, and Hulon and Audrey and entered on the cash books as sales, travel, or convention expense were actually expended by those persons for the purposes stated in connection with the business of B.B.C. The entire amounts in the "Amount Paid" columns in the schedule in the paragraph immediately preceding represent ordinary and necessary expenses (including travel expenses) paid during the years shown in carrying on the business of B.B.C. (c) Salaries - As stated previously, Griffith induced his two sisters, Jewell and Audrey, to leave their public school teaching positions in rural areas and come to Birmingham to help run the school. Although Audrey and Jewell knew that the prospect of immediate financial gain was not great, they believed Griffith's *85 story that they would be able to make "some money out of it." Audrey, Jewell, and Griffith agreed that when the school did make money they would pay themselves for their services in lean years which were anticipated in the beginning. Audrey worked full time, including many evenings and weekends, for B.B.C. during all of the years in question. She worked as bookkeeper for all of the years and for a while she acted as office manager. In addition, she worked as girls' counselor and as an instructor in the school and helped in student placement. Jewell worked full time, including many evenings and weekends, for B.B.C. during all of the years in question. She was an instructor in the school, teaching a full schedule in the morning and a part-time schedule in the evening. In addition, she was the purchasing agent, the student placement director, and, from 1945 the supervisor of the dormitory. In the latter position she was always on call. Griffith retained his position as principal of a public school until June 1942, when he resigned and became a full-time employee of B.B.C. Throughout all of the years in question he practiced law on a part-time basis. His practice was not extensive; most *86 of his time was spent in the service of B.B.C. From B.B.C.'s inception until February 1947, Hulon worked full time during regular working hours for Joe Mony Machine Co. and part time after working hours for B.B.C. From February 1947 throughout the remaining years in question he worked full time for B.B.C. Hulon's duties included working as office manager and as salesman. From B.B.C.'s inception until May 16, 1944, Carl held a regular job as a guard for a railroad and a part-time job for B.B.C. managing the night school. From May 16, 1944, until July 1948, Carl worked for B.B.C. as a full-time salesman on the road. From July 1948 through the remaining years in question, Carl worked full time for B.B.C. He helped on the Veterans' program, spent some time on the road as salesman, and held the post of athletic director of the school. Throughout the early years of B.B.C.'s existence it never had sufficient operating funds. It was consistently delinquent in meeting its obligations for operating expenses. Frequently Griffith, Jewell, and Audrey would borrow money to pay its obligations. There was a general commingling of the funds of Griffith, Jewell, Audrey, and B.B.C. Adequate records *87 were not kept of the financial transactions between the stockholders and B.B.C. During the years in question when the stockholders drew money from B.B.C. which was intended to apply on their salary, Audrey, the bookkeeper, would enter it in the cash journal as "Drawings." No salary account was kept in the ledger which showed the amount of salary paid and the amount of salary owing. Frequently the personal expenses of the stockholders would be paid by B.B.C. On occasion checks payable to B.B.C. would be deposited to the bank account of the individuals without the amounts' being recorded on the books of B.B.C. After B.B.C.'s certificate of tax exemption had been revoked, and in connection with a protest filed with the Commissioner regarding proposed deficiencies, the board of directors of B.B.C. consisting of Griffith, Jewell, and Audrey, had a meeting. At the meeting, they passed resolutions accepting affidavits from Griffith, Jewell, Carl, Hulon, and Audrey, respecting back salary claims. The salary claims from which all amounts previously drawn from B.B.C. were to be credited are as follows: Salaries Claimed
Year
Griffith
Carl
Jewell
Hulon
Audrey
1941
$ 400
0
$ 600
$ 250
$ 600
1942
3,800
$ 1,500
3,600
1,500
3,600
1943
4,800
1,500
3,600
1,500
3,600
1944
4,800
2,600
3,600
1,500
3,600
1945
4,800
3,600
3,600
1,500
3,600
1946
6,000
3,600
5,280
1,500
5,280
1947
6,000
3,600
5,280
3,300
5,280
1948
6,000
3,600
5,280
3,600
5,280
1949
6,000
3,600
5,280
3,600
5,280
1950
6,000
3,600
5,280
3,600
5,280
1951
6,000
3,600
5,280
3,600
5,280
Total
$54,600
$30,800
$46,680
$25,450
$46,680
*88 Gilbert, in his audit, segregated all payments made to the shareholders (and their spouses) and included therein the amounts marked drawings and the amounts paid by B.B.C. for their personal expenses. The Commissioner determined that a portion of these amounts represented salaries and the balance informal dividends. The determination of the portion which represented salaries was for most years based upon the amount shown on the respective individual returns as salaries from B.B.C. For some of the early years the Commissioner did not allow any salaries for the individual shareholders on the ground that they did not produce copies of their individual returns to Gilbert. However, on brief the Commissioner has conceded additional salaries for the years 1941-1947. The following schedule shows the amount of drawings and personal expenses paid by B.B.C., as shown by B.B.C.'s books per Gilbert's audit, and the amount thereof allowed as salary deductions to B.B.C. (in dollars): Griffith
Carl and Jewell
Hulon and Audrey
Year
Drawings
Allowed
Drawings
Allowed
Drawings
Allowed
1941
0
0
0
0
0
0
1942
$ 330.52
$ 400.80 [1]
$ 99.30
$ 99.30 *
$ 76.83
$ 76.83 *
*
1943
2,033.66
1,200.00 *
545.39
548.39 [1]*
654.84
654.84 *
1944
3,933.73
1,400.00 *
2,821.52
1,000.00 *
3,106.52
1,000.00 *
1945
4,234.12
1,600.00 *
3,551.13
1,000.00 *
2,954.05
1,000.00 *
1946
5,533.58
1,674.00 *
6,862.04
2,800.00 *
4,990.87
1,000.00 *
1947
7,508.56
1,675.00
5,246.21
2,400.00
5,297.05
3,400.00 *
1948
4,519.99
3,000.00
3,566.89
3,000.00
4,070.25
3,600.00
1949
4,241.27
3,600.00
5,189.58
2,800.00
5,582.91
3,600.00
1950
7,618.03
3,600.00
7,597.82
3,000.00
10,116.56
3,600.00
1951
4,552.27
4,200.00
5,433.57
3,000.00
15,138.19
3,600.00
Total
$44,505.73
$22,349.80
$40,913.45
$19,647.69
$51,988.07
$21,531.67
*89 All of the amounts in the "Drawings" columns of the schedule in the paragraph immediately preceding represent reasonable compensation for personal services rendered. However, the amount allowed Griffith for 1942 ($400.80) and the amount allowed Carl and Jewell for 1943 ($548.39) should be treated as reasonable compensation in accordance with the respondent's concession rather than the amounts shown in the drawings columns above. (d) Loans - Gilbert, in auditing B.B.C.'s books, found that certain amounts were paid to, or on behalf of, Griffith, Carl and Jewell, and Hulon and Audrey which, in his report, he entitled as alleged loans. The following schedule shows the amounts so found: Carl and
Hulon and
Year
Griffith
Jewell
Audrey
1942
$ 70.30
1943
5.00
$ 3.00
1945
18.00
1950
693.63
565.00
$17,447.92 The Commissioner determined all of the above amounts to be dividends. On brief, however, he conceded that the $70.30 *90 to Griffith in 1942 and the $3 to Carl and Jewell in 1943 should be allowed as a salary deduction. (See Findings re salary, supra.) No evidence has been introduced regarding the $5 to Griffith in 1943 and the $18 and $565 to Carl and Jewell in 1945 and 1950, respectively. (1) $693.63 to Griffith - During the year 1950, Griffith purchased in his own name a 1950 Chrysler automobile with B.B.C. funds. The 1950 Chrysler was shown on a statement of net worth as of December 31, 1950, prepared by Griffith, as one of his personal assets and was licensed in his name. Griffith used the automobile a great deal of the time on B.B.C.'s business. The 1950 Chrysler was wrecked in November 1950 and the cost of repairs amounted to $693.63, which amount was paid by B.B.C. The payment of the $693.63 by B.B.C. does not represent an ordinary and necessary business expense of B.B.C.; it represents an informal dividend to Griffith. [5] (2) $17,447.92 to Hulon and Audrey - In *91 1950, Hulon and Audrey started to build a house. Hulon acted as his own contractor. He applied for a construction loan but it was not approved because he did not employ a bonded contractor and because his earnings were not great enough. Before the construction was commenced and the loan disapproved, Hulon and Audrey had borrowed $200 from B.B.C. to use as earnest money for the purchase of the lot and had also borrowed $4,300 from B.B.C. to be used in purchasing the lot and building the house. The $4,300 was paid to Audrey by the Security Bank from B.B.C.'s account. The following letter on B.B.C.'s stationery authorized the payment: "June 16, 1950. "TO THE SECURITY BANK: "This is to certify that a personal loan of $4,300 is made to Audrey Spears of Birmingham Business College as an advance payment against her one-third interest in the earnings of the college, and to be strictly accounted for by her by audits of the books from time tome, showing that the stockholders each receive a like amount before she is relieved of this repayment. "SIGNED, "SS/John Ike Griffith President "RECEIPT AND ACCEPTANCE: "I hereby acknowledge receipt of the above mentioned $4,300 and the acceptance of same *92 this the 16 day of June, 1950. "Audrey Spears" When it developed that a construction loan could not be secured, Hulon and Audrey were in financial difficulties. They did not have sufficient funds to complete construction. Without approval of the shareholders, directors, or officers of B.B.C., they withdrew $12,947.92 from the school's funds. The total withdrawal during 1950 used in building the home was $17,447.92 ($12,947.92 plus $4,300 plus $200). The $17,447.92 was not recorded on B.B.C.'s books as a "loan receivable," or in any other manner. The total cost of the completed house, including landscaping, furnishings, etc., was $34,000. After the house was completed a mortgage on it was secured. Hulon and Audrey eventually repaid the entire $17,447.92 to B.B.C. Part of the proceeds of the mortgage was used to repay B.B.C. A substantial part of the repayment was by numerous payments of small amounts by Hulon and Audrey of B.B.C.'s expenses. The $17,447.92, determined by respondent to be a dividend to Audrey in 1950, did not constitute a dividend. It represented a loan from B.B.C. to Hulon and Audrey which was subsequently repaid. (e) Other deductions - Shortly before B.B.C. was organized *93 Griffith filed a petition for a creditors' arrangement in a United States District Court in Alabama. The debts arranged at that time totaled about $4,500, $2,800 of which related to the old Birmingham Business College. Although B.B.C. was not a party to the proceeding, it paid the $4,500 debt at the rate of $100 per month during the years 1941-1945. No part of the $2,800 owed by the old Birmingham Business College represented ordinary and necessary business expenses of B.B.C. The following schedule (.00 omitted) shows B.B.C.'s income and expenses as determined by the respondent (including concessions on brief) and the additional deductions and net income of B.B.C. after giving effect to our findings: 1941
1942
1943
1944
Gross In-
come
$782
$6,323
$13,318
$23,104
Deductions per resp.: General [1] *94 930
5,683 [2]
9,776
12,632
Sales ex-
pense
157
243
Salary
Additional
salary
576
2,403
3,400
Net income
per resp.
( $147)
$ 62
$ 981
$ 6,829
Additional Deductions per our Findings: Sales Ex-
pense
439
899
Salaries
830
6,461
Net Income
per our
Findings
( $147)
$ 62
($ 281)
($ 532)
1945
1946
1947
1948
Gross In-
come
$21,458
$39,764
$48,615
$64,058
Deductions per resp.: General [1]
5,458 [3]
17,220
23,790
46,369
Sales ex-
pense
730
819
1,050
1,050
Salary
1,800
6,475
9,600
Additional
salary
3,600
3,674
1,000
Net income
per resp.
$11,669
$16,250
$16,299
$ 7,038
Additional Deductions per our Findings: Sales Ex-
pense
2,029
2,166
3,028
3,756
Salaries
7,139
11,912
10,576
2,557
Net Income
per our
Findings
$ 2,500
$ 2,171
$ 2,694
$ 725
1949
1950
1951
Gross In-
come
$105,175
$153,524
$123,702
Deductions per resp.: General [1]
80,471
93,739
81,269
Sales ex-
pense
1,050
1,050
1,532
Salary
10,000
10,200
10,800
Additional
salary
Net income
per resp.
$ 13,653
$ 48,534
$ 30,099
Additional Deductions per our Findings: Sales Ex-
pense
2,020
3,524
Salaries
5,013
15,132
14,329
Net Income
per our
Findings
$ 6,618
$ 29,878
$ 15,775
II - Individual Petitioners The following schedule shows the gross income shown on the individual petitioner's returns and the amounts added thereto by the Commissioner in his respective notices of deficiency: Gross In-
Added by
come per
Commis-
Return
sioner
Jewell Carter
1945
No return
$ 4,585.15
Dividend
1946
No return
6,863.29
Dividend
Carl and Jewell Carter
1947
$2,400.00
4,875.79
Dividend
1948
3,000.00
2,699.39
Dividend
1949
2,800.00
4,145.48
Dividend
1950
3,000.00
6,660.82
Dividend
1951
2,862.67
137.33
Salary
2,422.27
Dividend
John Ike Griffith
1947
1,675.00
800.00
Prof. income
6,371.46
Dividend
1948
3,000.00
245.00
Prof. income
2,124.99
Dividend
1949
3,600.00
642.27
Dividend
1950
3,600.00
146.87
Prof. income
5,277.22
Dividend
Hulon and Audrey Spears
1948
3,600.00
1,488.75
Dividend
1949
3,600.00
2,246.51
Dividend
1950
6,000.00
23,025.11
Dividend
1951
4,940.84
11,538.19
Dividend [1] *95 II(A) - Dividends The above amounts described as dividends, which were added to the individual petitioners' incomes, consist of payments made to or on behalf of the individual shareholders. Gilbert segregated the payments into personal, which mainly represent amounts shown as drawings on B.B.C.'s books, sales expense, and alleged loans. The Commissioner allowed certain portions of each category as business expense deductions to B.B.C. and determined that in the years in which the individuals are involved the unallowed portions represented dividends paid to the individual shareholders. We have found as a fact that all of the amounts which were labeled sales expense by Gilbert represented actual sales expense of B.B.C. and ordinary and necessary business expenses of it. The amounts received by the individuals were expended by them, or they represented reimbursements, for ordinary and necessary selling and travel expenses of B.B.C. The amounts added by the Commissioner to the individuals' income as dividends should be reduced by the amounts of the additional sales expense which we allowed to B.B.C. during the years involved in the cases of the individual petitioners. We have *96 found as a fact that the $17,447.92 "alleged loan" to Hulon and Audrey in 1950 by B.B.C. was in reality a loan. The amount, therefore, did not represent income to them in 1950. Except for the adjustments for the sales expense and the $17,447.92 loan, we find the Commissioner's determination regarding the incomes from B.B.C. of the individual petitioners is correct. [6]
II(B) - Professional Income of Griffith Griffith received net legal fees [7] from his part-time practice of law as follows: Year
Amount
1945
$192.65
1946
8.50
1947
380.00
1948
245.00
1949
0
1950
146.87
The amounts received for 1947-1950 were not reported on his return for the respective years. [8] *97 Griffith turned over the amounts received by him as legal fees to B.B.C. and did not report them on his return for that reason. The Commissioner determined that Griffith received legal fees which were unreported as follows: Year
Amount
1947
$800.00
1948
245.00
1950
146.87
The Commissioner's determination is correct except for 1947 when Griffith received $380, rather than the $800 determined by the Commissioner. II(C) - Casualty Loss The 1950 Chrysler automobile which Griffith purchased in 1950 with B.B.C. funds was wrecked in November of 1950. The cost of repairs was $693.63. This amount was paid by B.B.C. and was determined by respondent to be a dividend to Griffith in 1950. (See Findings of Fact, re B.B.C., supra.) Respondent, on brief, concedes that Griffith is entitled to a casualty loss deduction in the amount of $600 on account of the wreck. Griffith suffered a casualty loss in the amount of $693.63 in 1950. III - Additions to the Tax [9]
Section 291(a) - B.B.C. B.B.C. did not file returns for the years 1941-1945 because Griffith thought that it did not have any net income. B.B.C. did not file returns for the *98 years 1946-1951 because of the opinion in the letter ruling of the Bureau of Internal Revenue dated July 16, 1946, supra. B.B.C.'s failure to file returns was not due to reasonable cause but was due to wilful neglect. Section 291(a) - Jewell. Jewell did not file returns for the years 1945 and 1946. She thought her husband had reported her income on his returns. Jewell's failure to file returns for 1945 and 1946 was not due to reasonable cause but was due to wilful neglect. Section 293(a). B.B.C. did not keep adequate books and records. The individuals did not report substantial amounts of income that they received from B.B.C. Part of the deficiency for each year for each party herein involved is due to negligence, or intentional disregard of rules and regulations. Section 294(d)(1)(A) and (d)(2). (No evidence has been introduced regarding these additions to the tax.) Opinion BLACK, Judge: Griffith, a public school teacher and a part-time lawyer, became involved in a business school operated by two other persons. The school encountered financial difficulties and Griffith extended his credit. Soon the two owners of the school left it in Griffith's hands. He induced his two sisters, *99 Jewell and Audrey, to leave their public school teaching positions in the country and come to Birmingham to help run the school. Although he did not promise them immediate financial gain he indicated that future prospects were favorable. After operating as an unincorporated business for a while Griffith decided to incorporate. He had heard that the Commissioner of Internal Revenue had ruled that a school could pay an employee a salary up to $10,000 and remain tax exempt. He drew the corporate charter of B.B.C. as a nonprofit educational institution so as to take advantage of the various laws granting such a corporation tax exempt status. From the beginning Jewell and Audrey devoted all of their time to the school's operations while their husbands, Carl and Hulon, and Griffith helped out on a part-time basis. After a few years Carl, Hulon, and Griffith left their other employment and devoted their full time to B.B.C.'s affairs. B.B.C., especially in the early years, was constantly short of working capital. There was a general commingling of the funds of B.B.C. with those of Griffith, Audrey, and Jewell. On numerous occasions the individuals lent money to B.B.C. or paid bills of B.B.C. *100 with their personal funds. B.B.C. also paid many of their personal bills. Records of the various financial transactions of B.B.C. were inadequate. B.B.C. did not file returns for any of the years through 1945. In 1946, it applied to the Commissioner for tax exempt status under section 101(6). Its application was incomplete and also contained erroneous information. The Commissioner granted tax exemption to B.B.C. by letter dated July 16, 1946. In 1951, however, the Commissioner's agent Gilbert began an investigation of B.B.C.'s affairs. B.B.C.'s records and books were inadequate and did not clearly show the receipts, expenditures or financial position of B.B.C. B.B.C. hired an accountant to prepare financial statements. The accountant spent considerable time auditing the affairs of B.B.C., as did Gilbert. As a result of the investigation and audit the Commissioner revoked B.B.C.'s tax exempt status and ordered it to file returns for all years since incorporation. B.B.C. refused; the Commissioner then issued a notice of deficiency determining deficiencies and additions thereto for the years 1942 to 1951, inclusive. I(A) - Tax Exempt Status of B. B.C. B.B.C. claims that it is a tax *101 exempt educational institution under section 101(6). [10]In order to prevail in its contention that it is an exempt corporation under section 101(6), petitioner must meet these three tests, viz: (1) It must be organized and operated exclusively for [educational purposes] one or more of the specified purposes; (2) Its net income must not inure in whole or in part to the benefit of private shareholders or individuals; and (3) It must not by any substantial part of its activities attempt to influence legislation by propaganda or otherwise. [Regulations 111, Sec. 29.101(6)-1.] The principal questions here are whether B.B.C., in light of its relationship with its three stockholders, Griffith, Jewell, and Audrey, has satisfied *102 the first and second tests. There is no contention that it does not meet the third test. After a careful consideration of the record we cannot find that B.B.C. has met its burden of proof to show that it is an exempt corporation under section 101(6). On the contrary, we think the facts indicate that B.B.C. was organized and operated, inter alia, for a commercial purpose, i.e., the pecuniary benefit of its shareholders and, further, that some part of its net earnings inured to their benefit. Griffith drew B.B.C.'s charter so as to gain tax exempt status under Federal and state law. However, the charter provides inter alia, that salaries of the shareholders shall be in proportion to their stockholdings. The certificates of ownership provide that each shareholder owns one-third of all of the assets of B.B.C. A letter from B.B.C. (by Griffith) to a bank authorizing a loan of B.B.C.'s funds to Audrey states that she (Audrey) has a one-third interest in the earnings of B.B.C. These recitals indicate the attitude of the shareholders regarding their relationship with B.B.C. It indicates a relationship similar to that existing between a commercial profit corporation and its shareholders. This *103 attitude is perhaps more clearly manifested by the actual dealings between the parties. There was a constant commingling of the funds of the shareholders and B.B.C. On occasion receipts of B.B.C. were deposited in the bank accounts of the individual shareholders without being recorded on B.B.C.'s books. Numerous personal expenses of the individuals were paid directly by B.B.C. On one occasion $17,500 was paid to Audrey by B.B.C. which we have found to be a loan to Audrey. This loan was not recorded on B.B.C.'s books. The foregoing facts, we think, indicate that B.B.C. was organized for a dual purpose. One purpose was educational, i.e., the organization and operation of a business school; the other was commercial, i.e., pecuniary benefit of its shareholders. Cf. Gemological Institute of America v. Riddell, 149 Fed. Supp. 128, 130 (S.D. Cal. 1957). And further we think that the shareholders did actually benefit contrary to the terms of the statute which prohibits any part of the net earnings from inuring to the benefit of any private shareholder or individual. There is no question but that Griffith, Jewell, and Audrey are "persons" having a personal and private interest in the activities *104 of B.B.C. within the meaning of Regulations 111, section 29.101-1(d) which defines the "private shareholder or individual" referred to in section 101(6) in that manner. However, the fact that B.B.C. is owned and controlled by private individuals is not sufficient to defeat its claim to exempt status. This is true despite the fact that the "private shareholders" are a family group. See I.T. 3220, 1938-2 C.B. 164. B.B.C. made substantial payments to or on behalf of these private shareholders. The respondent determined a large portion of these payments to be dividends. We have found as a fact that for most of the years the amounts were sales expenses and reasonable compensation. The payment of reasonable compensation to private individuals does not constitute inurement of net earnings to the recipient. Cf. Mabee Petroleum Corp. v. United States, 203 Fed. (2d) 872, 876 (C.A. 5, 1953). However, where such compensation is based on the net earnings of the corporation the same result does not necessarily follow. See Gemological Institute of America, 17 T.C. 1604 (1952), affd. per curiam 212 Fed. (2d) 205 (C.A. 9, 1954). See also Gemological Institute of America v. Riddell, supra. In *105 Gemological Institute of America (17 T.C. 1604), supra, the corporation, which was seeking exemption under section 101(6), paid Shipley, a valuable and essential individual in the corporation, a flat salary plus one-half of its net earnings as compensation. That the entire amount paid Shipley was reasonable compensation was not in dispute. We held, however, that: "Regardless of what these amounts are called, salary or compensation based on earnings, it is obvious that half of the net earnings of petitioner inured to the benefit of an individual, viz., Shipley. These earnings are too material to be ignored. Roger L. Putnam, 6 T.C. 702. Cf. Edward Orton, Jr. Ceramic Foundation, 9 T.C. 533, affd. 173 Fed. (2d) 483. Such a distribution of net earnings is unequivocally prohibited by the statute. The petitioner has failed to meet one of the essential tests of section 101(6). * * *" In the instant case there was no agreement as to the amounts to be paid the shareholders for their services to B.B.C. Indeed, it does not appear that the shareholders actually knew the amounts paid to them or on their behalf. It is clear, however, that these individuals withdrew substantially all of the *106 earnings of B.B.C., before their withdrawals, except for the amounts invested in capital expenditures. Also, it is clear that there was an inurement to the benfit of the individual shareholders in terms of increase in the value of the shares in B.B.C. The original $2,000 investment in B.B.C. had substantially increased in book value by December 31, 1951, by virtue of retained earnings. These retained earnings were represented primarily by investments in fixed assets. The shareholders' stock certificates stated that each of the shareholders owned one-third of the assets and, under Alabama law, [11] the proceeds of the sale of this property when and if B.B.C. ceased to do business would be distributed pro rata to the shareholders. Cf. Kemper Military School v. Crutchley, 274 Fed. 125, 127 (W.D. Mo., 1921). The fact that B.B.C. stock was of considerable value is in effect admitted by petitioners' contention that Audrey's one-third stock interest in B.B.C. served as security for the "alleged loan" of $17,447.92 from B.B.C. to her and Hulon. The petitioners' reliance on City of Birmingham v. Birmingham Business College (1951), 256 Ala. 551, 56 So. 2d 111, *107 and Birmingham Business College v. Whetstone (1955), 263 Ala. 369, 82 So. 2d 539 (both of which apparently involve petitioner) is misplaced. In the former case the court expressly recognized that B.B.C. was a business enterprise conducted for profit but held that a City of Birmingham licensing ordinance contravened the equal protection clause of the Fourteenth Amendment of the United States Constitution because it did not apply to other schools for profit. In the latter case the court held that B.B.C. was a college within the meaning of a state statute which exempted property used by a "college" from state taxes, and expressly noted that there was "no attack upon it [B.B.C.] for its organizational structure or its corporate purpose. " In neither case were the issues similar to those involved herein. If anything, the language in those cases supports the respondent rather than petitioners' contention herein. However, neither case is controlling since state law does not govern the disposition of the question here involved. Burnet v. Harmel, 287 U.S. 103, 110 (1932). B.B.C. also contends that the Commissioner cannot retroactively revoke his 1946 ruling that B.B.C. was exempt. We disagree. *108 It is settled that the "Commissioner's action may not be disturbed unless, in the circumstances of this case, the Commissioner abused the discretion vested in him by section 3791(b)." [12]Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 184 (1957). The record shows that B.B.C.'s application for tax exempt status in 1946 contained incorrect statements of fact upon which the Commissioner relied in ruling that it (B.B.C.) was exempt. [13] *109 This circumstance, we think, provides a sufficient basis for holding that the Commissioner did not abuse his discretion. B.B.C.'s final contention is that these proceedings are barred by the statute of limitations. However, since B.B.C. did not file returns for any years, no period of limitation is applicable. Section 276(a). [14] *110 Section 302 of the Revenue Act of 1950, [15] *111 which is relied upon by B.B.C., does not require a different result. That section was passed in conjunction with the passage of sections 421-424 (Supplement U) of the Internal Revenue Code of 1939, [16] which deal with the taxing of business income of certain section 101 organizations. The Senate Finance Committee Report (S. Rept. No. 2375, 81st Cong., 2d Sess. (1950) p. 118) states, inter alia, as follows: "Section 302 applies only where a denial of exemption might be made on the ground that the organization was carrying on a trade or business for profit, and nothing therein limits the denial of exemption for failure to meet the other requirement of section 101." Here, the exemption is denied because B.B.C. was not organized and operated exclusively for educational purposes and because part of its net earnings inured to the benefit of private shareholders or individuals. I(B) - Net Income of B.B.C. Since we have held that B.B.C. is not exempt from taxation under section 101(6), we must determine the income *112 of B.B.C. Respondent contends that the petition does not raise any issues for the years 1942 to 1950 other than whether B.B.C. is a tax exempt organization, i.e., no issue is raised regarding the determination of net income except for 1951. We have carefully read the 29-page petition. It is very inexpertly drawn and does not contain the clear and concise assignments of error and allegations of fact as required by Rule 7 of our Rules of Practice. However, a fair reading of the entire petition indicates that respondent's determination regarding the income of B.B.C. for the years 1942 to 1950 is in issue. The respondent's answer indicates that he understood the determination of income for the years 1942 to 1950 was in issue. The case was tried by both parties on the assumption that the income of B.B.C. for the years 1942 to 1950 was in issue. In the circumstances, we hold that the net income of B.B.C. for the years 1942 to 1951 is in issue. The Commissioner's determination for the years 1942 to 1950 was based on the report prepared by Gilbert after his lengthy audit of B.B.C.'s affairs. The determination for 1951 was based on the report prepared by Shinn after his audit. Both Gilbert *113 and Shinn testified at length regarding their reports and it appears that the basic amounts are as accurate as possible considering the fact that B.B.C.'s books and records did not adequately or accurately reflect its receipts or disbursements. The accuracy of most of the basic figures used by respondent in his determination is not seriously disputed by B.B.C. Indeed, the testimony and audit by Van Baalen, petitioner's witness, corroborate a substantial portion of Gilbert's basic findings. The dispute relates mainly to the treatment of certain items which we will hereafter discuss. 1. Gross Income - The V.A. informed Gilbert that it made payments to B.B.C. in the amount of $131,290.93 during 1950. Gilbert only found $111,788.27 entered on B.B.C.'s books. He, therefore, added the difference of $19,502.66 to the gross income per books. B.B.C. contends that the V.A. withheld some of the amounts which it had earned and that it did not receive payment until later years. Regardless of whether B.B.C.'s contention in this respect is correct it does not have any effect on the finding that $131,290.93 was actually received in 1950. We are convinced that this $131,290.93 did not include anything *114 which B.B.C. had earned but had not yet received. In circumstances, we sustain the respondent's determination regarding this item. Likewise, we sustain the respondent's determination regarding gross income for all years, there being insufficient evidence to show that any of the determinations are incorrect. 2. Deductions - (a) Capital Expenditures. The respondent did not include as deductions of B.B.C. the amount expended for the purchase of capital assets. He did, however, include deductions for depreciation on those assets, except land. Although petitioner objects to this treatment of capital expenditures, it is clear that the objections are not well founded. Section 24(a). Accordingly, we uphold the respondent's determination regarding capital expenditures. (b) Sales Expense. Throughout all of the years in question B.B.C. conducted an active campaign to enroll students. It employed salesmen who traveled throughout Alabama and neighboring states and, in addition, Jewell and Audrey traveled to various high schools putting on exhibitions relating to the benefits to be derived from a business education at B.B.C. The various employees who traveled as salesmen would usually be given expense *115 money. They were not required to account to B.B.C. for the expenditures actually made by them. The Commissioner allowed as deductions all of the amounts paid as sales expense to unrelated third parties but only allowed a portion of the amounts paid as sales expense to Griffith, Hulon and Audrey, and Carl and Jewell because of lack of substantiation. The disallowed portions were determined to be dividends. Although the books and records of B.B.C. were inadequate there is no contention and there is no basis for a finding that the items entered in the cash book were false. Griffith, Hulon and Audrey, and Carl and Jewell all testified regarding the amounts expended by them in the performance of selling activities. Although their testimony was for a large part general in nature we are satisfied that they expended all of the amounts which Gilbert found on the books as sales expense. Accordingly, all of the amounts listed in the sales expense schedule in our Findings of Fact, supra, as "Amount Paid" should be allowed as deductions to B.B.C. for ordinary and necessary business expenses. (c) Salaries. Audrey and Jewell worked for B.B.C. on a full-time basis from its inception while Griffith, *116 Carl, and Hulon began working on part-time basis but switched to a full-time basis as B.B.C.'s operation enlarged. They all devoted considerable time and effort to the task of making B.B.C. a financial success. They all worked many evenings and weekends. Griffith, Audrey, and Jewell had no definite agreement as to salary. In the early years, because of a shortage of working capital, they merely drew what they actually needed to live on. In fact, many of their personal expenses were paid directly by B.B.C. Carl and Hulon did have some sort of definite arrangement as to salary but because of B.B.C.'s financial condition they were not paid regularly. After B.B.C.'s financial position became better the shareholders, instead of making some definite arrangement as to salary, continued their prior practice although the amounts they withdrew from B.B.C. were substantially greater. They finally did enter into a formal salary agreement in 1952, a year which is not before us, in connection with a protest in these proceedings. Gilbert segregated all of the payments on B.B.C.'s books that were listed as drawings, together with amounts that were paid on their behalf. He labeled these payments "Personal." *117 The Commissioner allowed a portion of these amounts as salary and the balance he treated as dividends. For the most part the portion which the Commissioner allowed as salary deductions to B.B.C. was the same as the amounts shown by the individuals as income from B.B.C. on their individual returns. The manner in which the individuals arrived at the amounts shown on their returns is not clear except in the case of Griffith, who testified that he estimated the amount that he spent during the year and included that amount as salary from B.B.C. on his return. Respondent concedes that if all of the payments listed as personal by Gilbert are in fact compensation, they were reasonable in amount. The question, therefore, is whether these amounts were in fact compensation. We have found as an ultimate fact that all of the above-mentioned amounts were reasonable compensation for personal services rendered. In making this finding we have carefully considered respondent's argument and the fact that there was no formal authorization or agreements respecting salaries and that the individuals reported lesser amounts as salary than they received. But it appears to us that the financial affairs of B.B.C. *118 were so confused and there was such a degree of commingling and confusion of funds that neither B.B.C. nor the individuals knew the amounts which passed between them. However, we think that the intent of the parties was that the amounts paid to them or on their behalf were compensation for the time and effort they devoted to B.B.C.'s affairs. And since there is no question of reasonableness involved we think that B.B.C. must prevail on this issue. We so hold. It is true that in some of the later years the amounts paid to or on behalf of the individuals were large and might well constitute excessive compensation if it were only for the one year. However, we think that these amounts should fairly be regarded in part as compensation for past services, i.e., for the early years when the amounts received by the individuals were small. Since they are past services they are amounts paid for personal services "rendered" within the meaning of section 23(a)(1)(A). (d) Loans. Gilbert labeled certain payments which had been made to the individual shareholders as "alleged loans." It is not clear whether they were recorded on the books as loans or whether B.B.C. informed him that the amounts represented *119 loans. Regardless, the Commissioner determined all of the amounts so labeled as dividends. On brief, however, he has conceded certain small amounts so listed should be treated as compensation. Petitioner has not introduced any evidence regarding the $5 to Griffith in 1943 and the $18 and $565 to Carl and Jewell in 1945 and 1950, respectively. We, therefore, uphold the respondent's determination regarding those items. Two "loan" items remain and will be discussed separately. (1) $693.63 to Griffith. In 1950, B.B.C. paid $693.63 for repairs to an automobile which Griffith purchased in 1950 with B.B.C.'s funds. Griffith, who was counsel for B.B.C., stated at the trial that it did not matter how the $693.63 was treated as long as either he or B.B.C. received the deduction for the casualty loss. Respondent, on brief, contends that his determination regarding B.B.C. is correct but concedes that Griffith individually is entitled to a casualty loss deduction in the amount of $600. It appears that the automobile belonged to Griffith personally but that he used it a great deal of the time on B.B.C. business. We have allowed B.B.C. a deduction for sales expenses for amounts which it paid to Griffith *120 in 1950 for that purpose but we do not know whether any of that reimbursement was for the automobile's being used on B.B.C. business. In light of these facts and Griffith's statement at the trial, we uphold respondent's determination regarding this item as to B.B.C. See, however, the Findings of Fact, supra, and Opinion, infra, regarding Griffith's personal income. (2) $17,447.92 to Hulon and Audrey. In 1950, Audrey borrowed $4,500 from B.B.C. for the purposes of purchasing a lot and building a house thereon. She and Hulon negotiated for a construction loan to finance the major part of the construction but were turned down. Not having sufficient funds to complete construction they withdrew about $13,000 from B.B.C. Unlike the original $4,500 neither the directors nor the shareholders of B.B.C. approved a loan for the additional $13,000. After the house was completed, a mortgage was secured and after living in it for a while it was sold. The $17,500 was paid back to B. B.C. over the period of a few years. A substantial part of the repayment was by numerous payments of small amounts by Hulon and Audrey of B.B.C.'s expenses. Respondent determined the entire withdrawal of $17,447.92 to *121 be a dividend in 1950. We think the first $4,500 was clearly a loan. And in view of the fact that the entire amount was repaid as a loan we think that the entire $17,447.92 should be treated as a loan rather than a dividend. The fact that there was no note evidencing the loan or that the books of B.B.C. did not show the loan or repayment is outweighed by the other facts regarding the transaction. We think the record shows that Hulon and Audrey regarded the advancements as loans; that they had the intent to repay the withdrawals at the time they were made; and that that intent was carried out. Of course, as far as B.B.C. is concerned the item is still not deductible in computing its net income. A loan by a taxpayer to another is not a deductible expenditure. (e) Other Deductions. B.B.C. claims that it is entitled to an additional deduction of $2,800 spread out over the years 1942 to 1945. The facts indicate that shortly before B.B.C.'s inception Griffith petitioned a United States District Court in Alabama for a creditors' arrangement with respect to $4,500 owed by him to creditors. Of that amount, $2,800 represented a debt of the old school for which Griffith was liable. B.B.C., which *122 was not a party to the proceeding, paid the $4,500 to the creditors at the rate $100of per month through 1945. We see no merit in B.B.C's contention that it is entitled to a $2,800 deduction. The $2,800 does not represent a liability for business expenses of B.B.C. If it represents a liability for expenses it would be the liability and expenses of the old school, not B.B.C. Even if B.B.C. assumed the liability, which the record does not show that it did, we cannot see how the result would be different. B.B.C. also claims that it is entitled to additional deductions for amounts which it expended for the purchase of books. In support of this contention it has submitted a list of purported purchases. However, it has not shown that the amounts claimed have not already been allowed by respondent. And the record indicates that all payments to uninterested third parties for expenses were included in B.B.C.'s deductible expenditures. In addition, it appears that respondent's agent reconstructed B.B.C.'s gross income, at least partially, by the expenditures method. Therefore, any additional expenditures would also mean an equal amount of additional gross income with the net income remaining *123 constant. We uphold the respondent's determination regarding the net income of B.B.C. for all years, except for the adjustments heretofore made. II - Individual Petitioners A. Dividends. The respondent has determined that the individual petitioners received income from B.B.C. in the same amount that he determined B.B.C. had made payments to or on behalf of the individuals. Since the individuals had reported some of the amounts as salary he allowed that amount as a deduction to B.B.C. and determined that the difference was dividends to the individuals. The individuals do not seriously dispute receiving the amounts determined by the Commissioner. However, we have held that the amounts paid by B.B.C. as sales expenses were actually selling expenses deductible by B.B.C. rather than dividends. Implicit in that determination is the finding that individuals actually expended the amounts received by them in the conduct of B.B.C.'s business. Therefore, to the extent that the dividends or income of the individuals is based on the disallowance of sales expense to B.B.C., the Commissioner's determination is reversed. With respect to the other portion of the dividends we have held that they represent *124 reasonable compensation except for certain loans. The portion representing reasonable compensation would, of course, still be income to the individuals and we uphold the respondent in this regard. The portions representing alleged loans which the Commissioner determined to be dividends are also income to the individuals because of a failure of proof except for the $17,447.92 loan to Hulon and Audrey in 1950. We have found that amount ($17,447.92) to be a loan; therefore, the dividend to Hulon and Audrey for 1950, determined by the respondent as an addition to the income reported by them, should be reduced by that amount. B. Professional Income of Griffith. The respondent also determined that Griffith had income from his part-time law practice which he did not report. Griffith concedes that he did have such income but argues that he turned it all over to B.B.C. It is clear, therefore, that the Commissioner's determination is correct, except for the year 1947 when the evidence shows that only $380 was received rather than the $800 determined by the Commissioner. Griffith apparently makes some claim that he is entitled to a deduction for contributions under section 23(o) for the amount *125 of his legal fees. However, there is no merit to this contention since B.B.C. is not a corporation "organized and operated exclusively for * * * educational purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual." C. Casualty Loss. We have upheld the respondent's determination that Griffith received a dividend of $693.63 when B.B.C. paid that amount for repairs to his automobile which had been wrecked. Respondent concedes on brief that Griffith is entitled to a casualty loss on account of the wreck in the amount of $600. However, since $693.63 was paid to repair the automobile the loss to Griffith should be in that amount rather than the $600 conceded by the Commissioner. III - Additions to the Tax Section 291(a). B.B.C. did not file returns for any of the years involved. It did not request tax exempt status until 1946, and its application for such status in 1946, upon which the Commissioner relied, contained erroneous material statements of fact. Respondent determined that the addition to the tax provided in section 291(a) for failure to file a return is applicable. The addition is proper unless B.B.C. shows that its failure *126 was due to reasonable cause and not to wilful neglect. For the years prior to 1946, B.B.C. contends that it did not file a return because it had no income and for the years 1946 to 1951, because the Commissioner had ruled that it was tax exempt. The former reason clearly does not constitute reasonable cause and lack of wilful neglect. Cf. Burford Oil Co., 4 T.C. 613, 618 (1945), affd. 153 Fed. (2d) 745 (C.A. 5, 1946). The latter reason might, under some circumstances, constitute reasonable cause. But here the Commissioner, in granting the exemption, relied on B.B.C.'s application which contained erroneous material statements of fact. To allow petitioner to rely on the ruling as constituting reasonable cause would allow it to benefit from its own misstatements. This we cannot do. Since no other reason was given or appears in the record, we hold that the section 291(a) addition is applicable to B.B.C. Jewell did not file returns for the years 1945 and 1946. The reason for not filing was that she thought her husband had reported her income on his returns. That reason is insufficient for us to say that her failure to file was due to reasonable cause and not due to wilful neglect. *127 Cf. Burford Oil Co., supra.We, therefore, uphold the respondent's determination of the section 291(a) addition to the tax. Section 293(a). Respondent determined additions to the tax under section 293(a) for all petitioners for all years. Little or no evidence was introduced regarding this determination. It affirmatively appears that B.B.C. did not keep adequate books or records as required by the regulations and that the individuals ignored reporting a substantial amount of income received from B.B.C. In the circumstances, we must uphold the respondent's determination in this regard. Section 294(d)(1)(A) and (d)(2). The individual petitioners have not introduced any evidence regarding these additions. We, therefore, uphold the respondent's determination in this respect. All of the additions to the tax are, of course, subject to recomputation under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: Jewell Carter, Docket No. 56924; John Ike Griffith, Docket No. 56925; Hulon A. Spears and Audrey G. Spears, Docket No. 56926: and Birmingham Business College, Docket No. 56927.↩
2. All section references are to the Internal Revenue Code of 1939, as amended, unless otherwise noted.↩
3. The record does not show the amount or the years of payment of this type.↩
*. The State of Alabama, Department of Education, made Vocational Rehabilitation payments aggregating $5,295.88 to Birmingham Business College, Inc., during the period 1947 through 1950.
4. Gilbert's report did not show any amount paid as "Sales Expense" to the shareholders for the year 1941-1942. Shinn's report did not show any sales expense disallowed, as such, for the year 1951.↩
1. Gilbert found an alleged loan to Griffith of $70.30 in 1942 and one of $3 to Carl and Jewell in 1943, which the Commissioner determined to be a dividend. On reply brief the Commissioner allowed it as salary.↩
*. Includes additional amount allowed as salary expense by respondent on reply brief. ↩
5. Respondent has conceded, in accord with petitioners' claim at the trial in this cause (Transcript p. 225) that Griffith is entitled to a casualty loss on his personal return for the wreck. See Findings of Fact re Individuals, infra.↩
1. Including depreciation. 2. Includes net operating loss carryover of $147 from 1941. ↩
3. Does not include net operating loss carryovers from 1943 and 1944.↩
1. The Commissioner determined salary was $3,600 rather than the $4,940.84 reported. He therefore allowed a deduction of $1,340.84 ($4,940.84 minus $3,600). The net amount added by the respondent is, therefore, $10,197.35 ($11,538.19 minus $1,340.84).
6. It is true that we have found that certain portions of the payments by B.B.C. to the individual petitioners represent compensation rather than dividends, but nevertheless the amounts are income to the individuals.↩
7. Amounts received less amounts received as reimbursement for court cost and publication fees and amounts held in trust.↩
8. It also appears that the amounts received in 1945 and 1946 were not reported by Griffith. However, those years are not in issue.
9. These findings are in addition to the other findings, supra, which relate in one way or another to the propriety of the various additions to the tax involved herein.↩
10. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. * * * the following organizations shall be exempt from taxation under this chapter - * * *
(6) Corporations, * * * organized and operated exclusively for * * * educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *↩
11. Code of Alabama 1940, Title 10, Art. 8, Sec. 157.↩
12. SEC. 3791. RULES AND REGULATIONS. * * *
(b) Retroactivity of Regulations or Rulings. - The Secretary, or the Commissioner with the approval of the Secretary, may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision, relating to the internal revenue laws, shall be applied without retroactive effect. ↩
13. B.B.C. argues that supplemental letters and materials were submitted to the Commissioner which clarified and corrected the application. If there were such documents they are not a part of the record herein and we, of course, are bound by the record. Also, the stipulation states that the Commissioner relied on the application, which is a part of the record.
14. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. ↩
15. 64 Stat. 953, 954. The pertinent parts of the section are as follows: SEC. 302. EXEMPTION OF CERTAIN ORGANIZATIONS FOR PAST YEARS. (a) Trade or Business not Unrelated. - For any taxable year beginning prior to January 1, 1951, no organization shall be denied exemption under paragraphs (1), (6), or (7) of section 101 of the Internal Revenue Code on the grounds that it is carrying on a trade or business for profit if the income from such trade or business would not be taxable as unrelated business income under the provisions of Supplement U of the Internal Revenue Code, as amended by this Act, or if such trade or business is the rental by such organization of its real property (including personal property leased with the real property). (b) Period of Limitations. In the case of an organization which would otherwise be exempt under section 101 of the Internal Revenue Code were it not carrying on a trade or business for profit, the filing of the information return required by section 54(f) of the Internal Revenue Code (relating to returns by tax-exempt organizations) for any taxable year beginning prior to January 1, 1951, shall be deemed to be the filing of a return for the purposes of section 275 of the Internal Revenue Code (relating to period of limitation upon assessment and collection). In the case of such an organization which was, by the provisions of section 54(f) of the Internal Revenue Code, specifically not required to file such information return, for the purposes of the preceding sentence a return shall be deemed to have been filed at the time when such return should have been filed had it been so required. The provisions of this subsection shall not apply to a taxable year of such an organization with respect to which, prior to September 20, 1950, (1) any amount of tax was assessed or paid, or (2) a notice of deficiency under section 272 of the Internal Revenue Code↩ was sent to the taxpayer. 16. Section 301 of the Revenue Act of 1950.↩